# EXHIBIT H to
# DECLARATION OF WILLIAM HOCHBERG

1                        COHEN

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    _____x
     JUAN CATALA D/B/A MAJIC
5    ENTERTAINMENT LLC D/B/A
     ADRAWN MUSIC PUBLISHING,
6
               Plaintiff,
7
       - against -                    18-CV-08401-PGG
8
     JOOMBAS CO. LTD, JOOMBAS
9    MUSIC INT'L, JOOMBAS LLC,
     JOOMBAS MUSIC GROUP, HYUK
10   SHIN, THE LA REID MUSIC
     PUBLISHING COMPANY LLC, EMI
11   APRIL MUSIC INC., SONY/ATV
     SONGS LLC,
12
               Defendants.
13   _____x

14

15

16            DEPOSITION OF GARY COHEN

17                 Taken Remotely

18            Wednesday, March 9, 2022

19                 10:59 p.m. EST

20

21

22

23   STENOGRAPHICALLY REPORTED BY:

24   BRANDI BIGALKE, RPR, RSA, CSR No. 084-4870

25   JOB NO. 207806

1                    COHEN

2

3

4                 March 9, 2022

5

6

7        Deposition of GARY COHEN, held remotely

8   before Brandi N. Bigalke, Registered

9   Professional Reporter, Realtime Systems

10  Administrator, Stenographic Court Reporter and

11  Notary Public in and for the State of

12  Minnesota.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COHEN
 2   A P P E A R A N C E S:
 3
 4        Keith White
 5        Attorneys for Plaintiff
 6             198A Rogers Avenue
 7             Brooklyn, New York 11225
 8         By:  Keith White, Esq.
 9
10
11        Parness Law Firm
12        Attorneys for Defendants
13             136 Madison Avenue
14             New York, New York 10016
15        BY:  Hillel Parness, Esq.
16             William Hochberg, Esq.
17
18
19
20
21
22
23
24
25
```

1                          COHEN

2 _____INDEX PAGE_____

3 WITNESS           EXAMINATION BY         PAGE

4 GARY COHEN      Mr. Hochberg..................8

7 _____EXHIBITS_____

8 COHEN EXHIBIT                    PAGE

9 EXHIBIT 1...................................9

10 Cohen Expert Report

11 EXHIBIT 2...................................50

12 Court Order

13 EXHIBIT 3...................................93

14 Cohen Supplemental Report

15 EXHIBIT 4...................................100

16 Schedule A2

17 EXHIBIT 5...................................104

18 Exhibit F

19 EXHIBIT 6...................................127

20 Complaint Exhibit E

23 REPORTER'S NOTE: All quotations from exhibits
24 are reflected in the manner in which they were
read into the record and do not necessarily
indicate an exact quote from the document.

25

1          COHEN

2               * * *

3          THE COURT REPORTER:  We are on the

4    record.  I am Brandi Bigalke, court

5    reporter appearing for TSG Reporting.

6    Today's date is March 9 in the year 2022,

7    and the time is now 10:59 a.m. -- excuse

8    me -- 11 -- before I do this.

9          Mr. Cohen, what time zone are you

10   located?

11         THE WITNESS:  I'm in Eastern.  I'm

12   in New York.

13         THE COURT REPORTER:  You're in

14   Eastern.  Okay.  Sorry about that.  The

15   time is 12:00 p.m. Eastern Standard Time.

16         Okay.  We are taking the remote

17   videoconference deposition of Mr. Gary

18   Cohen.

19         Will counsel introduce yourselves

20   and state your affiliation for the record.

21         MR. HOCHBERG:  William Hochberg for

22   the Defendant, Hyuk Shin.

23         Do you need the spelling on that?

24         THE COURT REPORTER:  I've got that.

25   Thank you.

1              COHEN

2          MR. PARNESS:  Hillel Parness,

3      Parness Law Firm, also for Defendant.

4          MR. WHITE:  Sorry.  Keith White for

5      the Plaintiff, Juan Catala.

6          THE COURT REPORTER:  Thank you.

7          And do all counsel stipulate to the

8      swearing of the witness remotely by the

9      court reporter?

10         (All counsel so stipulated and the

11     court reporter remotely swore in the

12     witness:)

13              GARY COHEN

14  Called as a witness and having been first duly

15  sworn, testifies as follows:

16         THE COURT REPORTER:  Thank you.

17         You may begin, Counsel.

18         MR. HOCHBERG:  Okay.  I suggest that

19     the deposition will proceed pursuant to the

20     Federal Rules of Civil Procedure and

21     Evidence.  We relieve the court reporter of

22     her obligation to maintain the original

23     under the federal rules.  The original

24     transcript will be delivered to the

25     witness's counsel for delivery to the

1                    COHEN

2  legal document.  I would prefer to have my

3  client's attorney direct me with respect to the

4  court order or with respect to any

5  determinations.  I'm not going to opine without

6  direction here.

7      Q.    Well, you calculated damages in this

8  case, correct?

9      A.    Correct.

10     Q.    And for which cause of action did

11 you calculate damage?

12     A.    I calculated under the

13 determination, under the instruction that

14 Catala is due 50 percent of the publishing

15 income related to the subject compositions.

16     Q.    But my question was --

17     A.    You asked me how I did it.  That's

18 the answer.

19     Q.    That's not what I asked you.  I

20 asked you for what cause of action did you

21 calculate damages?

22     A.    You'll have to tell me which cause

23 of actions or the attorney will have to tell me

24 which causes of action they are.  You're asking

25 me to make legal interpretations which I'm

1              COHEN

2    not -- I'm not an attorney.  I was asked to

3    calculate royalties on an assumption.

4        Q.    Okay.  You just --

5        A.    Damages on an assumption.  So that's

6    what I did.  Don't tell me what I should have

7    done or what I just said.  That's what I did

8    and that's what it says in my report.

9              MR. HOCHBERG:  Could I ask the court

10        reporter to please read back not this

11        latest answer but the answer before this

12        latest one from Mr. Cohen.

13              (The requested portion was read back

14        by the court reporter.)

15              MR. HOCHBERG:  And did he say

16        something after that?

17              THE COURT REPORTER:  No.  That's

18        when you asked me if I would read back.

19        Would you like the one before it?

20              MR. HOCHBERG:  No, that's okay.

21    BY MR. HOCHBERG:

22        Q.    Okay.  I'm going to read through

23    this section right here starting with the --

24    reading this paragraph on Page 16 of the order

25    from Judge Gardephe, and that's

1                    COHEN

2    will be granted."

3              Do you understand what I just read?

4         A.    In part.  I don't want to make a

5    legal determination.

6         Q.    Can you tell me your understanding

7    of what I just read.

8         A.    I don't want to make a legal

9    determination.

10             MR. WHITE:  Note my objection

11        continuous.

12   BY MR. HOCHBERG:

13        Q.    Can you give me any understanding --

14   and you can take a moment to reread it if you

15   like.

16        A.    I'm not going to make a

17   determination about a legal document,

18   Mr. Hochberg.  I am not a legal expert.  I am a

19   damages expert.  And I did a damages report

20   based on the -- based on the assumptions that I

21   was provided by my client and my client's

22   attorney.

23        Q.    So you're refusing to answer?

24             MR. WHITE:  Objection.

25             THE WITNESS:  Obviously I'm not

1                         COHEN

2          However, I'm not the one being deposed

3          here.

4                  So here's what we're going to do.

5          When I have a chance to ask Mr. Cohen

6          questions, now that it's an issue, I will

7          introduce the supplemental report and all

8          of its exhibits into evidence in this

9          deposition.

10   BY MR. HOCHBERG:

11        Q.   So, Mr. Cohen, I asked you what

12   assumptions Mr. White asked you to make with

13   regard to the songs as far as what songs to

14   include and what songs not to include.

15                 And what were those instructions?

16        A.   General instruction is that for all

17   the relevant compositions, that Catala is due

18   50 percent of the publishing income.

19        Q.   What instructions did he give you as

20   to what the relevant compositions were?

21        A.   Those that were entered into --

22   those that are written or acquired before

23   January 1, 2014.

24        Q.   And when did he give you those

25   instructions?

1              COHEN

2 of damages then?

3     A.    No.  It's part of the total estimate

4 of damages.

5     Q.    And what's the difference between

6 partial estimate of damages and part of total

7 estimate of damages?

8     A.    You take the $599,000 that are in

9 this document and combine them with the amounts

10 which is 568,000 that are on Schedule B and

11 then you have the total amount of damages.

12    Q.    So the first item on this report is

13 Warner/Chappell Advance?

14    A.    Correct.

15    Q.    The dollar amount there is 666,500,

16 correct?

17    A.    Correct.

18    Q.    Has that number changed between this

19 supplemental report and the original report?

20    A.    No.

21    Q.    And what methodology did you use to

22 arrive at your figure of $667,500?

23    A.    The Warner Chappell agreement, which

24 is referred to in my original report, is a

25 publishing agreement that Shin did with

1                    COHEN

2   Warner Chappell in which he was paid

3   750 million won I think.  And I took an

4   exchange rate from won to US dollars of .0089,

5   and I came up with $667,500 which is amounts

6   that Shin received for his deal with Warner

7   Chappell --

8        Q.   And you --

9        A.    -- can I finish?  You asked me a

10  question and I'm trying to --

11       Q.   Certainly.  Excuse me.

12       A.   You're welcome.

13            So it's my understanding that Catala

14  is due 50 percent of this amount.

15       Q.   Okay.  You said you saw an agreement

16  that substantiates the basis for this amount of

17  money.  You said you saw that agreement?

18       A.   Yes.  That's part of the documents I

19  believe in the original complaint.  Let me find

20  the reference if you'd like me to.

21       Q.   Please do.

22       A.   Okay.  That's the supplemental

23  report.  I think we have to go back to

24  exhibit --

25       Q.    I think it's Exhibit F, if I may, to

1                        COHEN

2    the original complaint.  And I can put it up as

3    an exhibit if that's helps.

4        A.    That's all I would say is that it's

5    Exhibit F.  But if you'd like to put it up,

6    that's --

7        Q.    Yeah.  Let's -- is there any other

8    agreement besides Exhibit F to the complaint

9    that you looked at regarding this so called

10   Warner Chappell agreement?

11       A.    Not that I recall.

12       Q.    Okay.  So let me put this in the

13   chat and we'll call this an exhibit as well.

14            MR. HOCHBERG:  Can we go off the

15       record for a moment again?

16            (Off the record.)

17            (Deposition Exhibit 5 was marked for

18       identification.)

19            MR. HOCHBERG:  Back on the record

20       again, please.

21            Back on the record, and we're

22       marking this document which is Exhibit F to

23       the original complaint in this case as

24       Exhibit 5 did we say?

25            THE COURT REPORTER:  Yes.

1                      COHEN

2              MR. HOCHBERG:  Five.  And I'm going

3         to screen save this one.

4    BY MR. HOCHBERG:

5         Q.    Can you see this?

6         A.    I can.

7         Q.    Is this the document that you were

8    referring to earlier regarding your first item

9    on your estimate of damages?

10        A.    I understand what you mean, and yes.

11        Q.    Okay.  Is this a contract?

12        A.    Can I see the whole document?  Can

13   you stop, start at the top?

14        Q.    Yeah.

15        A.    It looks like it's a proposal for an

16   administration agreement.

17        Q.    And do you consider that to be an

18   agreement?

19        A.    I would have to defer to the

20   attorneys to determine whether that's an

21   agreement or not.

22        Q.    Can you answer this question either

23   yes, no, or I don't know?

24              Is this a contract?

25        A.    I don't know.

1              COHEN

2     Q.    And yet you used it as the basis for

3  your estimate of 667,500 owed or used to come

4  up with your damage calculation, correct?

5     A.    Not correct.  I used half of that

6  amount.  Not the total.

7     Q.    And you made an assumption that this

8  was an agreement, didn't you?

9     A.    I made an assumption that Shin

10 received the advance referred to in this

11 document.

12    Q.    And how did you come up with that

13 assumption?

14    A.    I was advised by counsel.

15    Q.    And which counsel?

16    A.    I only have one counsel here.

17 Mr. White.

18    Q.    So Mr. White told you this was an

19 agreement and that Mr. Shin received money as a

20 result thereof?

21    A.    Mr. White told me that this was

22 relevant to my calculation, I should include

23 it.

24    Q.    Okay.  But you see here now that

25 this is a proposal.

1                          COHEN

2              In the first sentence of the

3    agreement, it says that it's a proposal for an

4    agreement, correct?

5         A.    That's what the document says.

6         Q.    Do you have any evidence to suggest

7    that it's anything other than a proposal?

8              MR. WHITE:  Objection.

9              MR. HOCHBERG:  You can answer the

10        question.

11             THE WITNESS:  I have no other

12        documents related to this advance.

13   BY MR. HOCHBERG:

14        Q.    And do you see a signature on this

15   document?

16        A.    I do not.

17        Q.    Have you ever seen this document

18   with a signature on it?

19        A.    No.

20        Q.    And what proof do you have that this

21   document substitutes an agreement that was ever

22   entered into?

23             MR. WHITE:  Objection.

24             THE WITNESS:  In my view, the

25        relevant -- I don't know if there are

1                          COHEN

2          extrinsic documents or not, but I am

3          referring to the advance in this document

4          and whether it was paid or not.

5     BY MR. HOCHBERG:

6          Q.    And you were instructed or you were

7     told by Mr. White that Mr. Shin received money

8     as a result of this document, correct?

9          A.    Mr. Shin received money as to his

10    relationship with Warner Chappell.  There may

11    be other documents that I haven't seen.

12         Q.    Oh, so now you're saying there may

13    be other documents that you haven't seen?

14         A.    I just said that, yes.

15         Q.    And where might one find such a

16    document?

17              MR. WHITE:  Objection.

18              THE WITNESS:  I don't have it.

19         Maybe Mr. Shin has it.

20    BY MR. HOCHBERG:

21         Q.    Okay.

22         A.    I don't know.  I don't know anything

23    more than I was advised to include this advance

24    in my calculation and so I did.

25         Q.    And did Mr. Catala tell you anything

1                    COHEN

2    about this document?

3              MR. WHITE:  Objection.

4              THE WITNESS:  No, he did not.

5    BY MR. HOCHBERG:

6         Q.    And if there is no other document

7    pertaining to this alleged advance, you would

8    agree that there's no basis for you to have a

9    line item of $667,500 in your damage estimate,

10   wouldn't you agree?

11        A.    No.

12             MR. WHITE:  Object.

13             THE WITNESS:  I would not agree.

14        It's whether the money was paid to Shin or

15        Joombas or not.

16             Not having the books of Shin or

17        Joombas I can't determine whether or not he

18        received this amount of won in 2017 or not.

19   BY MR. HOCHBERG:

20        Q.    Did you ask Mr. White any questions

21   about the advance, alleged advance, or did you

22   accept his word that --

23        A.    Of course I accepted his word.  Why

24   would he lie to me?

25        Q.    Do you have any evidence of this

1          COHEN

2  being a completed contract with money paid?

3       A.    I do not have anything more than

4  this document related to this transaction with

5  Warner Chappell Music.

6       Q.    So you accepted Mr. White's

7  instructions, no questions asked, correct?

8       A.    I accepted Mr. White's instructions,

9  yes.

10       Q.    And if it turns out that there is no

11  evidence of an advance being paid to Mr. Shin

12  and this proposal, you would remove that item

13  from your damage calculation, wouldn't you?

14       A.    I would remove it if I'm advised

15  that the amounts were not paid.

16       Q.    And did you consider doing an

17  independent verification to see if this

18  agreement was ever entered into?

19       A.    As I said in my report, I asked for

20  all documents related to income received by

21  Shin.  I did not receive all documents.  I

22  never saw his books.  I never saw Joombas's

23  books.  It may have been in won which would be

24  unreadable to me.

25            I wasn't given a whole hell of a lot

1          COHEN

2   information of a financial nature.  I did the

3   best with what I had.  I was advised by counsel

4   to include this amount, so I did.

5       Q.    And you understand that Joombas is

6   not a party to this action anymore, right?

7       A.    I under -- I don't know if that's

8   the case.  I'll defer to Mr. White on that.

9       Q.    And is your damage calculation

10  generally, is it based on profit only to Shin

11  or is it based on profit to Shin and Joombas?

12      A.    Shin and his related companies, but

13  it's not based on -- it's based on -- it's

14  based on net publisher's share related to the

15  acquired compositions or compositions written

16  by Shin.  So that's a little different.

17          If Shin erroneously took an acquired

18  composition and threw it into Joombas, then

19  it's an acquired composition.  If it was

20  written before January 1, 2014.  Written and

21  registered, I would say, or acquired.

22      Q.    So you did include -- you did

23  include profits to Shin or profits to

24  Joombas --

25      A.    I didn't -- I didn't use profits.

1                    COHEN

2        Q.    Well, you included net income to

3   Shin and to Joombas, correct?

4        A.    I included what -- I included what I

5   was given.  A lot of it was indecipherable.  As

6   I said, I never saw Joombas's books.  I never

7   saw Shin's books.  I did note that Shin was

8   understating his actual ownership share of

9   compositions and that's what led to this --

10  partially to this action.

11       Q.    And was it Mr. White that told you

12  to consider Joombas income or profits to

13  Joombas, correct?

14       A.    He told me to consider this document

15  and to include the advance.

16       Q.    And so you're making an assumption

17  that everything was erroneously handed by Shin

18  to Joombas; isn't that correct?

19       A.    No.  Shin kept some things in his

20  own name.

21       Q.    And how do you know that Shin

22  allegedly underreported income?

23       A.    Because I'm advised by that by

24  counsel.

25       Q.    So Mr. White --

1                    COHEN

2         A.    Yeah.   That's part of the action.

3    And in addition, I saw in the SCORE reports

4    that were just part of the exhibits we just put

5    up here, the writer splits, that Shin reported

6    very small percentages as being writer and then

7    those were used by Sony ATV to calculate very

8    small amounts of money to Catala.   So I

9    uplifted them in my Schedule B to get to what

10   was the appropriate percentage that should have

11   been paid on the -- uplifted on the income paid

12   to Catala by Sony ATV.

13        Q.    Well, that's a fine answer but to a

14   question that I didn't ask you.

15        A.    Okay.   You got an extra then.

16        Q.    Okay.   Did Mr. White tell you to

17   exclude anything that went to Joombas from your

18   calculation?

19        A.    I'm not sure I included anything.

20   He did not specifically give me that

21   instruction.

22        Q.    And Mr. White told you that Mr. Shin

23   allegedly was making small -- was allocating

24   small songwriter percentages to compositions,

25   and you assume that they were too small,

1              COHEN

2  correct?

3      A.    That's in the complaint.

4      Q.    But you assumed that to be the case,

5  correct?

6      A.    I assumed that to be the case.

7      Q.    And it was Mr. White who told you

8  that Mr. Shin was allegedly reporting smaller

9  percentages in terms of songwriting than he

10  should --

11     A.    My understanding is that Shin

12  allegedly assigned percentages of songs he

13  wrote or acquired to writers -- to other

14  writers, and he allegedly did not report

15  registering some songs that were registered

16  perhaps overseas.  That's what the complaint is

17  about, in my words of course.

18     Q.    So Mr. White told you that the

19  percentages Shin stated for himself were too

20  small, correct?

21          MR. WHITE:  Objection.  Objection.

22          Bill, that's asked and answered four times

23          now.

24          MR. HOCHBERG:  You can answer the

25          question.

1                    COHEN

2          MR. WHITE:  No, he cannot answer the

3     question.  Move on.

4          MR. HOCHBERG:  I'm sorry.  You're

5     instructing the witness not to --

6          MR. WHITE:  I'm instructing him not

7     to answer the question, yes.

8          MR. HOCHBERG:  On what basis?

9          MR. WHITE:  On the basis that it's

10    been asked and answered four times and

11    you're trying to create something else that

12    doesn't exist here.

13         MR. HOCHBERG:  Completely

14    inappropriate objection.

15   BY MR. HOCHBERG:

16    Q.    Mr. White -- sorry.

17         Mr. Cohen, do you know -- have you

18   done an independent inquiry into those

19   percentages to determine whether they were too

20   small?

21    A.    No.

22    Q.    And were you ever in the room when

23   songwriters were creating songs that are

24   reflected in any of these statements?

25    A.    I'm sorry?

1                    COHEN

2  April 1 of 2011?

3       A.    Correct.

4       Q.    Rather than September of 2012, which

5  is six years before the filing of the

6  complaint?

7       A.    Is that a question?

8       Q.    Yes.

9             Is that correct?

10      A.    He told me it starts April 1, 2011.

11  I just answered that.

12      Q.    Right.  Now, April 1 which is April

13  Fool's Day by the way, but April 1 was the date

14  of the first contract that Mr. Catala had

15  Mr. Shin sign, April 1.

16            Are you aware that that was the date

17  of the first contract?

18      A.    I'd have to go look at the contract.

19      Q.    Okay.

20      A.    Do I need to?

21      Q.    No.  I just thought you might

22  recall.  It seems that that's the confusion

23  here.

24      A.    I don't think -- that's not my

25  confusion.  I was given this date.

1                    COHEN

2        Q.    So Mr. White gave you that date; I

3   understand.

4              Okay.  Number 4 going up a couple

5   numbers here.  Number 4 it says, "Except for

6   publically-available information as otherwise

7   stated herein, the information I relied on in

8   this analysis was provided to me by counsel.  I

9   did not independently verify the accuracy and

10  completeness of this information."

11             When you say publically-available

12  information, can you explain that a little bit?

13       A.    The internet.

14       Q.    And that's a big thing, the

15  internet.  Is there any particular --

16       A.    The public is a big thing.

17       Q.    I'm sorry?

18       A.    I said the public is a big thing.

19       Q.    Right.  But you say the internet.

20  Is there --

21       A.    Well, if I wanted to look -- if I

22  wanted to research something, I would generally

23  first look on Wikipedia or something to see if

24  I could find it.  If I was to research it.  But

25  generally I relied on information provided to

1              COHEN

2    me by counsel.

3         Q.    So you can't point to any like

4    publically-available information in particular

5    that you looked at in order to verify the

6    accuracy and completeness of this information?

7         A.    Correct.

8         Q.    Okay.

9         A.    Not that I recall sitting here

10   anyway.

11        Q.    And when you say at the end of that

12   Number 4, "I did not independently verify the

13   accuracy and completeness of this information,"

14   but you could have verified the accuracy and

15   completeness of this information in some

16   regards; is that correct?

17        A.    I don't know.

18        Q.    Okay.  Number 5 here.  It says, "I

19   requested complete financial information

20   related to royalties received by Shin, his

21   company Joombas as relates to compositions Shin

22   wrote or acquired, including all sources of

23   revenue for all relevant compositions.  To

24   date, I did not receive this information."

25             And so who did you request -- you

1                        COHEN

2    50 percent of the publisher's share.

3         Q.    Catala is not entitled to any of the

4    writer share; is that correct?

5         A.    That's my understanding.

6         Q.    And Catala -- strike that.

7               Okay.  In Number 9 you say that

8    Mr. Shin's writer share is understated in the

9    statements at issue in this case, correct?

10        A.    I say that, yes.

11        Q.    And how do you know that?

12        A.    I was advised by counsel and that's

13   what the case was about in the complaint.

14        Q.    Okay.  And moving down to your

15   analysis.  When you say, I tabulated the amount

16   of royalties reported to Catala for the period

17   2014 to 2019 -- beginning of 2014 to the end of

18   2019 for each subject composition.

19               But you're not sure whether those

20   subject compositions fall within the relevant

21   time period or not in terms of when they

22   were --

23        A.    I am sure because I was advised they

24   were.

25        Q.    So because you were advised that

1               COHEN

2 they were by Mr. White, you are certain that

3 that is a fact, correct?

4      A.    I'm advised that -- my calculation

5 is based on that.  I didn't do further

6 research.

7           As I said if you would like to

8 dispute any of the compositions on my list,

9 you're certainly free to do so and present a

10 rebuttal report.

11      Q.    So you have an amount on number F

12 here, I'm looking at 11F.  Roman Numeral IV,

13 11F.  You say the result is $381,032.

14      A.    Correct.

15      Q.    And what does that amount represent?

16      A.    It represents the revised amount of

17 royalties that should have been paid to Catala

18 had the percentages in 11D been used instead of

19 the percentages that Sony ATV paid Catala.

20           This is all -- this paragraph 11 is

21 an attempt to put in words to calculations that

22 are on Schedule B.  You may want to look at it

23 in conjunction with Schedule B to help your

24 understanding of what I did.

25      Q.    Then on number I at the bottom of

1              COHEN

2    Number 11 here.

3         A.    Yes.

4         Q.    You say, "The net amount due Catala

5    with respect to royalties reported by Sony ATV

6    to Catala is $568,094."

7         A.    Correct.

8         Q.    And that -- that's an amount you

9    calculated by looking at the Sony royalty

10   statements that you got a few days ago,

11   correct?

12        A.    I explained in this analysis how I

13   got to that number and Schedule B is the

14   calculations on a spreadsheet.

15        Q.    But they're based on the statements

16   from Sony, correct?

17        A.    Correct.  From Sony to Catala.

18        Q.    And so you know how much Catala was

19   paid by Sony pursuant to those statements?

20        A.    Yes.  It's on Schedule B.  Page 3 at

21   the bottom.

22        Q.    How much is that?

23        A.    $161,438 rounding.

24        Q.    And that is a total amount from

25   beginning to end?

1          COHEN

2    of co-publishing and Catala should have been

3    paid 1.5 percent -- times that I believe.

4          Q.    Do you have any idea why Mr. Catala

5    would be paid 1 and a half times of what

6    Mr. Shin was paid, if that's true?

7          A.    I believe Catala was owed, what was

8    it, 37 and a half percent and Shin was owed 25

9    percent.

10         Q.    Of what?

11         A.    Of the settlement amount that

12   LA Reid paid him.

13         Q.    Well, why in your understanding

14   would Mr. Catala be entitled to 1 and a half

15   times more than what Mr. Shin --

16         A.    Because I was advised that by

17   counsel.

18         Q.    So Mr. White told you that

19   Mr. Catala should be paid 1 and a half times

20   more than what Mr. Shin was paid?

21         A.    In the settlement as an alternative

22   calculation, yes.

23         Q.    And have you -- do you have any idea

24   of what Mr. Catala, what services Mr. Catala

25   provided to Mr. Shin?

1                    COHEN

2         A.    He was a copublisher.

3         Q.    Well, publishing -- what does a

4    co-publisher do?

5         A.    He originally was the publisher.  He

6    administered the compositions and collected the

7    money, paid the writer.  That's what a

8    publisher typically does.

9         Q.    But you read Contract 1, didn't you?

10        A.    Did I read it?

11        Q.    Yeah.

12        A.    I reviewed it, yes.

13        Q.    Reviewed.

14        A.    I don't remember it sitting here.

15        Q.    Do you remember that it stated, in

16   Contract 1, that those functions that you just

17   stated, which is administration, would be

18   handled by EMI and not by Mr. Catala?

19        A.    Is that in Contract 1?

20        Q.    Yes.

21        A.    I don't recall.

22        Q.    You don't recall that.

23              So what other -- did you ever have

24   an interview with Mr. Catala in connection with

25   being hired or working on this case?

1                          COHEN

2        A.    Did I ever have an interview?  I

3   might have spoke to him along the way.

4        Q.    Did he ever tell you anything about

5   what he did for Mr. Shin's career, if anything?

6        A.    No.

7             MR. WHITE:  Objection.

8   BY MR. HOCHBERG:

9        Q.    But you just take it on faith from

10   Mr. White that he should be paid 1 and a half

11   times what Mr. Shin is paid?

12        A.    I was advised that that's the

13   percentage and so that's what I used.

14             You have to remember I'm a damages

15   expert here.  I'm not -- if I'm given

16   information by counsel, I apply it.  If it

17   could be verified, great.

18        Q.    But you state a basis which

19   Mr. Catala should receive 1 and a half times

20   what Mr. Shin did even though you have no

21   knowledge of anything that Mr. Catala is

22   responsible for doing, including collecting --

23        A.    I did not interview -- I did not

24   interview Mr. Catala.

25             MR. WHITE:  Just note my

1                        COHEN

2         MR. HOCHBERG:  For the record,

3    Mr. White signed off.

4         Mr. Cohen, you are instructed not to

5    confer with your counsel under any

6    substantiate issue.

7         (The witness logged off and left the

8    deposition proceeding.)

9         MR. HOCHBERG:  We're still on the

10   record.  It is not over.

11        It was improper for Mr. Cohen and

12   Mr. White to just leave without -- we had

13   planned to ask a couple more questions and

14   then to arrange for a continuation of this.

15        So you know, the deposition remains

16   open and we'll just be in touch with you,

17   Brandi.  Thank you.

18

19        (Whereupon, the deposition was

20   adjourned at 4:22 p.m. EST)

21

22

23

24

25

1          J U R A T

2

3    I,              , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on              ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _____ day of _____, 20   ,

11   at _____,          .

12

13

14

15

16

17   _____

18          SIGNATURE OF WITNESS

19

20

21

22

23

24

25

```
 1   NAME OF CASE:

 2   DATE OF DEPOSITION:

 3   NAME OF WITNESS:

 4   Reason Codes:

 5         1.  To clarify the record.

 6         2.  To conform to the facts.

 7         3.  To correct transcription errors.

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                           _____
```

1                         COHEN

2                 C E R T I F I C A T E

3


4    STATE OF MINNESOTA)
                        ) SS.:
5    COUNTY OF HENNEPIN)

6


7         BE IT KNOW, that I, Brandi N. Bigalke,
     RPR, RSA, Stenographic Court Reporter, do
8    hereby certify that the foregoing transcript of
     GARY COHEN, in the matter of JUAN CATALA D/B/A
9    MAJIC ENTERTAINMENT LLC D/B/A ADRAWN MUSIC
     PUBLISHING versus JOOMBAS CO. LTD, JOOMBAS
10   MUSIC INT'L, JOOMBAS LLC, JOOMBAS MUSIC GROUP,
     HYUK SHIN, THE LA REID MUSIC PUBLISHING COMPANY
11   ·LLC, EMI APRIL MUSIC INC., SONY/ATV SONGS LLC,
     is true, correct and accurate;

12

13        That said transcript was prepared under my
     direction and control from my stenographic
14   shorthand notes taken on Wednesday,
     March 9, 2022;

15

16        That I am not related to any of the
     parties in this matter, nor am I interested in
17   the outcome of this action;

18

19        That the cost of the original has been
     charged to the noticing party, and that all
20   parties who ordered copies have been charged at
     the same rate for such copies;

21

22        WITNESS MY HAND AND SEAL this 11th of
     March, 2022.

23

24   _____
     Brandi N. Bigalke, RPR, RSA, CSR NO. 084-4870
25   Stenographic Court Reporter