UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUAN CATALA, d/b/a MAJIC
ENTERTAINMENT LLC, d/b/a
ADRAWN MUSIC PUBLISHING,

                         Plaintiff,

    - against -

JOOMBAS CO LTD, JOOMBAS MUSIC
INT'L, JOOMBAS LLC, JOOMBAS
MUSIC GROUP, HYUK SHIN, THE LA
REID MUSIC PUBLISHING COMPANY
LLC, EMI APRIL MUSIC INC., and
SONY/ATV SONGS LLC,

                     Defendants.

**MEMORANDUM**
**OPINION & ORDER**

18 Civ. 8401 (PGG) (GWG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Juan Catala, d/b/a Majic Entertainment LLC ("Majic"), d/b/a Adrawn

Music Publishing (collectively, "Catala") brings this action against Defendant Hyuk Shin;

Defendants Joombas Co. LTD., Joombas Music Int'l, Joombas LLC, and Joombas Music Group

(collectively, the "Joombas Defendants"); and the LA Reid Music Publishing Company, LLC

("Reid"), EMI April Music Inc. ("EMI"), and Sony/ATV Songs LLC ("Sony") (collectively, the

"Reid Defendants").  The Complaint asserts claims for breach of contract, breach of fiduciary

duty, fraud, tortious interference with contractual relations, violation of the Copyright Act, and

for an accounting.  (Cmplt. (Dkt. No. 1) ¶¶ 35-112)

        Shin, the Joombas Defendants, and the Reid Defendants moved to dismiss the

Complaint.  (Dkt. Nos. 50, 67)  On September 23, 2019, this Court granted the motions to

dismiss submitted by the Joombas Defendants and the Reid Defendants.  This Court granted in

part and denied in part Shin's motion to dismiss.  (Sept. 23, 2019 Order (Dkt. No. 80))

On April 30, 2022, Catala moved for summary judgment on his remaining claim against Shin (Pltf. Mot. (Dkt. No. 145)), and Shin cross-moved for summary judgment on May 2, 2022.  (Shin Mot. (Dkt. No. 155))  Catala has also moved to strike Shin's affirmative defenses.  (See Pltf. Br. (Dkt. No. 152) at 19-25)[1]

For the reasons stated below, Plaintiff's motion for summary judgment will be denied, and Defendant Shin's motion for summary judgment will be granted.  Plaintiff's motion to strike Defendant's affirmative defenses will be denied as moot.

## **BACKGROUND**

I.     **FACTS**[2]

A.     **The Parties and the Co-Publishing Agreements**

Shin is a musician and executive producer (Pltf. Subm., Ex. 11 ("Shin Dep.") (Dkt. No. 146-1) at 14-15)  Juan Catala is a music producer, and he owned Majic and was its sole

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  In his Local Rule 56.1 Statement, Plaintiff states that "Defendant did not provide a timely response to . . . Plaintiff's Request for Admissions" and that, accordingly, "the Admissions identified in [Plaintiff's Request for Admissions] are admitted."  Plaintiff cites to these "Admissions" as evidence supporting his statement of facts.  (Pltf. R. 56.1 Stmt. (Dkt. No. 165) at 2 n.1)  Shin argues that "all references to the 'Shin Admissions' [ ] are improper."  (Shin Opp., Ex. 21 ("Shin Resp. R. 56.1 Stmt.") (Dkt. No. 166-21) at 2; see also Shin Opp. (Dkt. No. 166) at 5 n.2 ("Plaintiff asserts in his [Rule 56.1 Statement] (but not in his brief) that Defendant [Shin] admitted all of the Requests for Admission served upon him.  This is incorrect, for the reasons detailed in Defendant's [Response and Counterstatement to Plaintiff's Rule 56.1 Statement]." (citation omitted)); Shin Reply (Dkt. No. 167) at 11 ("Plaintiff takes the unsupportable position that all of his Requests were admitted, but that is simply incorrect." (emphasis omitted))

It is undisputed that Plaintiff emailed the Request for Admissions to Defendant Shin on February 9, 2022.  (Pltf. Subm., Ex. 33 ("White Decl.") (Dkt. No. 150-5) ¶ 3; Shin Opp., Ex. 1 ("Hochberg Decl.") (Dkt. No. 166-1) ¶ 23)  According to Shin, he emailed his responses to Plaintiff on March 14, 2022.  (Hochberg Decl. (Dkt. No. 166-1) ¶ 24)

employee.  Majic is now defunct.  (Pltf. Subm., Ex. 12 ("Catala Dep.") (Dkt. No. 146-2) at 58-

63, 196)  Juan Catala and Shin met in approximately 2008 or 2009.  (Pltf. R. 56.1 Stmt. (Dkt.

No. 165) ¶ 1)[3]

On April 1, 2009, Majic entered into a "Co-Publishing/Exclusive Administration

Agreement" with Shin and non-party Sean Hamilton ("Contract 1").  (Shin R. 56.1 Stmt. (Dkt.

_____

Fed. R. Civ. P. Rule 36(a)(3) states that "[a] matter is admitted unless, within 30 days after being
served, the party to whom the request is directed serves on the requesting party a written answer
or objection . . . .  A shorter or longer time for responding may be stipulated to under Rule 29 or
be ordered by the court."  Fed. R. Civ. P. Rule 36(a)(3).  Because Plaintiff served Shin with the
Request for Admissions on February 9, 2022, Shin's response was due on Friday, March 11,
2022.  Shin emailed his response on Monday, March 14, 2022, however.  (See Shin Opp., Ex. J
(Dkt. No. 166-11) at 2)

"[T]he failure to respond in a timely fashion does not require the court automatically to deem all
matters admitted."  Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Tripodi,
913 F. Supp. 290, 294 (S.D.N.Y. 1996).  "Rather, Rule 36(b) provides that the Court, on motion,
may permit an admission to be withdrawn or amended if (1) 'it would promote the presentation
of the merits of the action' (2) without 'prejudic[ing] the requesting party in maintaining or
defending the action on the merits.'"  Paniagua v. Walter Kidde Portable Equip., Inc., 183 F.
Supp. 3d 473, 482 (S.D.N.Y. 2016) (alteration in original) (quoting Fed. R. Civ. P. 36(b);
Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983)).

This Court construes Shin's papers as requesting a ruling that his response to Plaintiff's Request
for Admissions be deemed timely.  (See Shin Opp. (Dkt. No. 166) at 5 n.2; Shin Reply (Dkt. No.
167) at 11)  The Court finds that such a ruling promotes "presentation of the merits of the
action."  Moreover, Plaintiff has not suffered unfair prejudice, given Shin's three-day (one
business day) delay in responding to Plaintiff's Request for Admissions.  Accordingly, Shin will
not be deemed to have admitted all of Plaintiff's Requests for Admissions as a result of his late
response.

[3]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted.");  Local Civ. R. 56.1(d) ("Each
statement by the movant or opponent . . . , including each statement controverting any statement
of material fact, must be followed by citation to evidence which would be admissible.").  Where
the opposing party disputes the moving party's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the opposing party's
characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

No. 159) ¶ 1; see also Shin Decl., Ex. 1 ("Contract 1") (Dkt. No. 157-1))  On May 1, 2009, Majic

entered into an "Exclusive Co-Publishing and Administration Agreement" with Defendants Reid

and EMI ("Contract 2").  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 8; see also Shin Decl., Ex. 2

("Contract 2") (Dkt. No. 157-2))

### 1.   **Contract 1:  The Majic-Shin Agreement**

Contract 1 – which identifies Majic as "Publisher" and Shin, Hamilton, and their

designees and Affiliates[4] as "you" – requires Shin to "Deliver to Publisher, for exclusive

exploitation, all Compositions,"[5] and provides that "Publisher will be the exclusive co-publisher

and exclusive administrator of all Compositions."  (Contract 1 (Dkt. No. 157-1) at 2)

---

("In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").

Because "a Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are otherwise unsupported in the record,' . . . 'where the record does not support the assertions in a Local 56.1 statement, those assertions [have been] disregarded and the record reviewed independently.'"  Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

[4]  Contract 1 defines "Affiliates" as "any Person which you own or in which you have interest, in whole or in part, or which you employ or which employs you, and/or any Person, the operation of which is controlled directly or indirectly by you."  (Contract 1 (Dkt. No. 157-1) § 12(e))  Contract 1 defines "Person" to mean "any individual, corporation, partnership, association or other organized group of persons of whatever nature, or legal successors or representatives of the foregoing."  (Id. § 12(g))

[5]  Contract 1 defines "Compositions" as "(a) all musical compositions . . . written by you prior to or during the Term [of Contract 1] and (b) any and all other compositions written by you and/or acquired by you or your Affiliates during the term [of Contract 1]."  (Contract 1 (Dkt. No. 157-1) § 3)  Contract 1 defines "Delivery" and "Delivered" as "the actual receipt by Publisher at EMI Music Publishing[,] 75 9th Avenue, 4th Floor, New York, New York 10011."  (Id. § 12(c))

Pursuant to Contract 1, "Publisher is granted 50% of the copyright" of each composition "written entirely by you."[6]  (Id. § 3)  Contract 1 further provides that Shin

> hereby sell[s], transfer[s] and assign[s] to Publisher . . . an undivided 50% interest in all of Your Interest in the Compositions, including without limitation in and to all copyrights therein . . . . It is the essence of this Agreement that Publisher acquire an undivided 50% interest in all of Your Interest in all Compositions.

(Id. § 5(a))  Contract 1 defines "Your Interest" as "that percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition."  (Id. § 3)

Contract 1 further provides that

> it is the intent of the parties that Publisher . . . shall be the exclusive administrator of all rights in and to the Compositions and Publisher shall have . . . the broadest possible rights to administer one hundred percent (100%) of Your Interest in the Compositions and otherwise exploit the Compositions.  Accordingly, with respect to Your Interest in the Compositions, Publisher . . . shall have the sole and exclusive right . . . to:  license the exploitation of the Compositions in all forms, media, technologies and configurations . . . ; print, publish, rent and/or sell printed editions and other reproductions of the Compositions . . . ; collect all monies whatsoever derived from exploitation of the Compositions, whenever earned; license public performance rights . . . ; make arrangements, adaptations and other changes; and otherwise administer and grant rights in, and with respect to, the Compositions to the fullest extent possible.  In connection with the foregoing, you hereby appoint Publisher your true and lawful attorney to secure and renew copyrights, initiate and compromise infringement claims, and to execute in your name any and all documents reasonably necessary or desirable to accomplish the foregoing and/or effectuate Publisher's rights hereunder.

(Id. § 5(b))

Contract 1 further provides that "[d]uring each Contract Period, you shall Deliver to Publisher ('Minimum Delivery and Release Commitment' or 'MDRC') at least four (4) Full New Compositions, or the fractional equivalent."[7]  (Id. § 4)

---

[6]  Contract 1 terms such compositions "New Compositions" or "Full New Compositions." (Contract 1 (Dkt. No. 157-1) § 3)

[7]  Contract 1 defines "Contract Period" as "the First Contract Period, or any Option Period, of the Term of this Agreement."  (Contract 1 (Dkt. No. 157-1) § 12(d))

Contract 1 also requires Shin to "represent, warrant and covenant that," inter alia, he "ha[s] not entered into (and will not enter into) any agreement (including, without limitation, any license) which would interfere with any of the rights granted to Publisher pursuant to this Agreement."  (Id. § 9(a))  Contract 1 provides that Shin "will not perform or render any services for the purposes of writing musical compositions that either directly or indirectly for any person or entity other than Publisher and . . . will not enter into [any] agreement with respect to any Compositions[] or rights with respect thereto."  (Id. § 9(b))

Contract 1 also sets out the structure for royalty payments among Majic, Shin, and Reid.  It contemplates Majic's receipt of royalties from Reid pursuant to Contract 2, and provides that "[f]rom all royalties actually received by Publisher from Reid under [Contract 2] from the exploitation of Compositions throughout the world . . . , Publisher shall," after making certain deductions, "pay to you an amount equal to fifty percent (50%) of the balance remaining, and the remaining fifty percent (50%) thereof shall be retained by Publisher for its sole use and benefit." (Id. § 6(a))  Majic, similarly, agrees to pay Shin fifty percent of advances received from Reid

---

The Term of this Agreement ("Term") shall consist of a First Contract Period beginning as of [April 1, 2009] with Publisher having the options to extend the Term for additional, immediately consecutive Contract Periods (the "First Option Period," the "Second Option Period," the "Third Option Period" and so forth; each, an "Option Period"), if any, as set forth by Publisher's agreement (the "Reid Agreement") with LA Reid Music Publishing Company, LLC and EMI Music Publishing, Inc. ("Reid"). Each Contract Period shall continue until the later of:  (i) one year following commencement of such Contract Period; or (ii) thirty (30) days following Reid's receipt of written notice accurately reflecting complete fulfillment of the Minimum Delivery Commitment for such Contract Period.  Publisher may exercise each such option by sending written notice to you at any time prior to the expiration of the then-current Contract Period.  Each such option shall be deemed automatically exercised by Publisher unless Publisher shall give you written notice to the contrary at any time prior to the date that the applicable Contract Period would otherwise expire.  For purposes of clarity, the Term of this Agreement shall be cotermin[o]us with the term of the Reid Agreement.

(Id. § 2)

pursuant to Contract 2, after making certain deductions, and retain the remaining portion of the advances.  (Id. § 6(b))

Finally, Contract 1 provides that it "shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]," and provides that, in entering Contract 1, Shin "agree[s] to amend or modify any provisions of [Contract 1] to conform to the provisions of [Contract 2]," and agrees to "comply with any other restriction, and . . . grant any additional rights, as may be required by Reid" pursuant to Contract 2.  (Id. § 13)

### 2.   Contract 2:  The Reid Agreement

Contract 2 – which identifies Reid and EMI as "Publisher," Majic as "you," and Shin and Hamilton each as "Writer" – is also "an exclusive co-publishing and administration agreement."  (Contract 2 (Dkt. No. 157-2) at 2)  Contract 2 states that, during the term of the agreement, Majic "shall cause Writer to Deliver to Publisher, for exclusive exploitation, all Compositions," and that "Publisher will be the exclusive administrator and co-publisher of Your Interest in all Compositions."[8]  (Id.)  However, Contract 2 also states that "You" – that is, Majic – "shall Deliver to Publisher" – that is, Reid and EMI – "each Composition."  (Id. § 3)  Pursuant

---

[8]  Contract 2 employs different terminology than Contract 1 in defining "Compositions":  "New Compositions" are "all musical compositions . . . written by Writer during the Term"; "Old Compositions" are "all musical compositions . . . written by Writer prior to the Term"; and "Acquired Compositions" are "all musical compositions . . . in which any right or interest is acquired by Writer or Writer's Affiliates prior to or during the Term."  (Contract 2 (Dkt. No. 157-2) § 3)  Contract 2 defines "Affiliates" as "any Person which you or Writer own or in which you or Writer have an interest, in whole or in part, or which you or Writer employ or which employs you or Writer, and/or any Person, the operation of which is controlled directly or indirectly by you or Writer."  (Id. § 11(c))

Contract 2 defines "Delivery" or "Delivered" as "the actual receipt by Publisher at its offices in New York, New York."  (Id. § 11(b))  Contract 2 provides that "[a]ll notices to Publisher shall be sent c/o EMI April Music Inc., 75 Ninth Avenue, Fourth Floor, New York, NY 10011."  (Id. § 12(b))

to Contract 2, Majic agrees to "sell, grant, transfer and assign" to Reid and EMI "an undivided 50% interest in all of [Majic's] Interest in the Compositions, including, without limitation, the copyrights therein." Majic "retain[s] the remaining 50% copyright interest." (Id. § 5)

**B.**     **Contract 3:  The Modification**

On January 1, 2014, nearly five years after Contracts 1 and 2 were executed, Reid, EMI, Majic, Shin, and Hamilton amended Contract 2 pursuant to a Settlement Agreement that Reid, EMI, Shin, and Hamilton had entered into with third parties.[9] This agreement is "Contract 3." (Shin Decl., Ex. 3 ("Contract 3") (Dkt. No. 157-3) at 2) According to Contract 3, "Hamilton and Shin . . . made various claims that Majic . . . failed to make required royalty payments to them under [Contract 1]." (Id. § 1(d)) Consequently, Hamilton and Shin "wish[ed] to modify certain provisions of [Contract 2], including . . . certain payment and Delivery obligations." (Id. § 1(e))

Whereas Contracts 1 and 2 contemplate Shin's (and Hamilton's) delivery of Compositions to Majic, and Majic's delivery of those Compositions, in turn, to Reid and EMI, Contract 3 requires Shin and Hamilton to perform "any and all obligations" for Reid and EMI "which relate to the Compositions, [and] Delivery thereof," and makes them jointly and severally liable with Majic for those responsibilities, "[n]otwithstanding that all of the obligations to [Reid

---

[9] The Settlement Agreement was entered into by Vance Tate, Thomas Oliveria, and their company, New East Management, on the one hand, and Reid, EMI, Hamilton, and Shin on the other, and was fully executed in October 2011. (Contract 3 (Dkt. No. 157-3) at 14-24) According to the Settlement Agreement, in August 2008, New East Management, Shin, and Hamilton entered into a contract, pursuant to which New East Management would render personal management services to Shin and Hamilton. Shin and Hamilton terminated this contract in February 2009. (Id. at 14) Tate, Oliveria, and New East Management contended that, under this contract, they were entitled to certain post-term commissions on revenues Shin and Hamilton earned, and were entitled to a portion of the copyright interest in one of Shin's and Hamilton's songs. In March 2011, Tate, Oliveria, and New East Management brought suit in this District, and the Settlement Agreement resolved that lawsuit. (Id.)

and EMI] under [Contract 2] are solely Majic's obligations." (Id. § 2)  Contract 3 also

significantly alters the payout of royalties and advances related to Shin's Compositions, such that

Reid is obligated to pay directly to Shin certain royalty shares and advances, rather than routing

those payments through Majic.  (Id. §§ 5-6)  With respect to royalties, "the royalties otherwise

accruing to Majic's credit under [Contract 2] shall be divided among Majic's, Shin's, and

Hamilton's royalty accounts." (Id. § 6)  Likewise, "any future [a]dvances payable under

[Contract 2]" would be paid out separately and "charged to their respective royalty accounts."

(Id. § 5)

      In Contract 3, Majic, Shin, and Hamilton "fully release and forever discharge

Reid and EMI . . . from any legal cause of action whatsoever now or hereafter existing under any

law . . . any time prior to January 1, 2014."  Shin and Hamilton also "fully release and forever

discharge Majic . . . from any legal cause of action relating to the accounting and/or payment of

royalties now or hereafter existing under any law . . . any time prior to January 1, 2014." (Id. §

4)  Majic does not release any claims against Shin in Contract 3, however.

### C.   The Tolling Agreement

      On April 14, 2017, Shin, Majic, Reid, and EMI entered into a tolling agreement

(the "Tolling Agreement").  The Tolling Agreement – which identifies Majic, Reid, and EMI

collectively as "Publisher" – acknowledges that

> Publisher has asserted claims that, beginning in 2011 and through [April 14,
> 2017], Shin acquired certain musical compositions and has delivered those
> compositions to Joombas Co. Ltd. ("Joombas") allegedly in breach of [Shin's
> obligations under Contract 2, as modified] and failed to deliver those acquired
> compositions and income derived from such compositions.

(Shin Decl., Ex. 5 ("Tolling Agreement") (Dkt. No. 157-5) at 2)  The Tolling Agreement further

states that Shin denies the breach claim, and contends that Contract 2 is unconscionable, and that

he has not received payments due under Contract 2.  (Id.)

In the Tolling Agreement, Shin, Majic, Reid, and EMI

agree that commencing as of April 14, 2017 and continuing until 30 days after the date on which either Shin or Publisher provide . . . notice of termination [of the Tolling Agreement], . . . the running of time under any statutes of limitation or any other time-based limitations or defenses . . . that might be asserted as a bar, limitation, or defense to any suit, action or claim arising out or in connection with [the claims the Publishers and Shin raised against one another would be tolled].

(Id.)

On June 29, 2018, Sony – which "at some point" acquired EMI (Catala Dep. (Dkt. No. 146-2) at 35) – provided notice of termination of the Tolling Agreement. (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 22)

## D. June 2018 Settlement Agreement

On June 1, 2018, Reid, EMI, Shin, and Joombas Co., Ltd. entered into a Settlement Agreement (the "2018 Settlement Agreement"). (Simonian Decl., Ex. A ("2018 Settlement Agreement") (Dkt. No. 69-1) at 2, 11) The 2018 Settlement Agreement states that Reid and EMI "contend that Shin has failed to deliver certain musical compositions to them, in violation of his obligations under [Contract 2 and Contract 3]"; that Shin denies these allegations; but that Reid, EMI, Shin, and Joombas Co., Ltd. "desire to settle their dispute amicably." (Id. at 2) Under the terms of the 2018 Settlement Agreement, Shin and Joombas Co., Ltd. agree to pay a sum of money to Reid and EMI. Shin, Reid, and EMI agree that "[s]olely as between [them], [Contract 2] shall terminate effective as of the date of execution of [the 2018 Settlement Agreement]," and Contract 3 "shall terminate concurrently with the termination of [Contract 2]." (Id. §§ 3.1, 4.1) The parties to the 2018 Settlement Agreement also agree to "release, acquit and forever discharge" one another from "any and all causes of action, claims for relief, lawsuits, charges or complaints" they "ever had or [have] against [the other] with respect to [Contract 2 and Contract 3]." (Id. §§ 5.1-5.2)

10

The 2018 Settlement Agreement repeatedly states that it does not bind or otherwise affect Majic's rights under the various contracts.  For example, in the Recitals section of the 2018 Settlement Agreement, the parties state that they "specifically exclud[e] from the said settlement any claims that may belong to or be separately capable of being asserted by Majic under the terms of [Contracts 1, 2, and 3]."  (Id. at 2)  Likewise, in the "Parties Bound" section, the parties state that the 2018 Settlement Agreement "specifically exclud[es] . . . Majic as to whom this Settlement Agreement is not binding."  (Id. § 1)  And although the 2018 Settlement Agreement terminates Contracts 2 and 3 as between Reid, EMI, and Shin, "[n]otwithstanding anything to the contrary contained in [Contracts 1, 2, and 3] . . . the termination of [Contracts 2 and 3] shall not effect a termination of [Contract 1] insofar as it pertains to the rights of Majic thereunder and Majic shall retain any and all rights and claims under [Contract 1] as if [Contract 2 and Contract 3] had not been terminated."  (Id. § 4.1)  Indeed, "[a]s between [Shin and Joombas, Co., Ltd.] and Majic, any rights, claims and defenses that Majic has or may have under [Contracts 1, 2, and 3] . . . shall survive this termination."  (Id.)

### E.    **Compositions and Delivery**

In the Complaint, Plaintiff alleges that "Shin acquired in excess of One Hundred and Fifty (150) compositions from 2009 through 2017," and Plaintiff lists 122 of these compositions in exhibits to the Complaint.  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 27-28; Cmplt. (Dkt. No. 1) ¶ 18; id., Exhs. E, H, I (Dkt. Nos. 1-5, 1-8, 1-9))  This Court dismissed Plaintiff's breach of contract claim "as to conduct that took place after Contract 3 was executed," however, and Contract 3 was "effective as of January 1, 2014."  (Sept. 23, 2019 Order (Dkt. No. 80) at 17; Contract 3 (Dkt. No. 157-3) at 2)  Accordingly, Plaintiff cannot recover for Compositions written or acquired by Shin after January 1, 2014.

In moving for summary judgment, Shin contends that only 14 of the 122 listed Compositions were released before January 1, 2014.  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 29) He further contends that "[t]he scope of any cognizable breach of the 'delivery' provision of Contract 1 is . . . limited to these . . . compositions."[10]  (Shin Br. (Dkt. No. 158) at 21)  Plaintiff admits these facts, "with the additional clarifying assertion that this list is illustrative, not exhaustive of the compositions where Defendant failed to Deliver his entire interest to Plaintiff or Sony."  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶¶ 30-32)  But in stating that Shin's "list is illustrative, not exhaustive," Plaintiff cites deposition testimony that does not name any other compositions that were released before January 1, 2014 in which "Defendant failed to Deliver his entire interest."  (See Pltf. Subm., Ex. 9 (Dkt. No. 145-11) at 28-29, 64-66); Shin Dep. (Dkt. No. 146-1) at 48-50, 84-100, 103, 122, 124)  Because Catala does not name any other compositions that Shin was required to deliver under Contract 1, the Court concludes that Shin's list of fourteen Compositions is in fact "exhaustive" as to the number of Compositions in which Shin and his Affiliates allegedly "failed to Deliver [their] entire interest to Plaintiff and Sony" as required under Contract 1.  (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶¶ 30-32)

---

[10]  These compositions are:  "Black Pearl," "Don't Go," "Dream Girl," "G.R.8.U.," "Growl," "Hello," "Light Up The Darkness," "Pretty Girl," "Real 100%," "Romantic St.," "Say U Say Me," "Voodoo Doll," "Want You Back," and "We Don't Stop."  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 30)

Shin also addresses two additional compositions – "Eternity" and "Heaven's Day" – that were released after January 1, 2014, but before July 1, 2014, "out of an abundance of caution and solely for the purposes of [his] motion, as it is within the realm of possibility that these compositions were 'written or acquired' before January 1, 2014, even though they were released months later." (Id. ¶¶ 31-32; Shin Br. (Dkt. No. 158) at 9, 21 n.3)  As discussed above, because this Court dismissed Plaintiff's breach of contract claim "as to conduct that took place after Contract 3 was executed," and because Contract 3 was "effective as of January 1, 2014" (Sept. 23, 2019 Order (Dkt. No. 80) at 17; Contract 3 (Dkt. No. 157-3) at 2), only the fourteen Compositions that were released before January 1, 2014 are at issue.

Shin contends that he and his Affiliates did in fact deliver to Plaintiff their entire interest in these fourteen Compositions that were released before January 1, 2014.  (See Shin Br. (Dkt. No. 158) at 21 ("Each of these [fourteen] [C]ompositions . . . was delivered." (emphasis omitted))  Indeed, Shin claims that these fourteen Compositions "'were [later] delivered by Majic . . . to [Sony], or to an entity for whom [Sony] or its predecessors acted as administrator.'" (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 37-38 (quoting Hochberg Decl., Ex. C (Dkt. No. 156-3) at 5-6))

Plaintiff contends, however, that there is a much larger category of songs that Shin failed to deliver in a proper fashion.  According to Catala, Shin was required to deliver hundreds of other songs to Majic or Sony that he had created or acquired but registered under the names of other writers signed to his company, in order to avoid his obligations under Contract 1.  (See Pltf. Br. (Dkt. No. 152) at 14-15 ("But the Defendant didn't just fail to comply with his contractual duty, the Defendant took additional steps to conceal his interest in musical compositions by registering his publishing interest in subject compositions to other writers that he controlled through a separate company."); Pltf. Opp. (Dkt. No. 162) at 16 ("The Defendant never complied with [Contract 1's] requirement [to deliver Defendant's entire interest in all musical compositions that were written or acquired by Defendant or Defendant's Affiliates to Plaintiff] because the Defendant transferred the majority of his interest in musical compositions to his company, Joombas, between 2011 and 2014."))

In the Complaint, Catala alleges that "Shin purposely and knowingly attempted to defraud Majic of revenue associated with the songs/compositions Shin acquired and authored, and hid the songs from Majic for several years."  (Cmplt. (Dkt. No. 1) ¶ 22; see also id. ¶ 25 ("Shin and Joombas defrauded Majic by hiding the compositions and failing to provide them to

Majic and Reid.")) When asked at deposition to identify "one song that Shin did not deliver pursuant to [Contract 1]," Catala testified that "[i]f you actually go to the [C]omplaint, I believe there's 150 songs that I listed that were not being collected until after we listed them." (Catala Dep. (Dkt. No. 146-2) at 120) Catala further testified that

> there's over 150 songs that I believe that should fall under Contract 1, that are out there, that I'm not being paid on.
>
> And those songs are not part of an exhibit [to the Complaint], because they might be songs that I haven't even discovered yet. This man has been stealing, fraudulently putting songs in other names, reducing the – the amount of percentages on the royalties.
>
> I don't know how much there is. I think there might be 300 songs. There's a lot of songs out there that – upwards to a couple hundred that I have not received a penny on. That's my testimony, and that's my belief.

(Id. at 259-60)

Catala explained that "'[i]t's not that [Shin] didn't deliver [the songs], he didn't place them in his name, so that – so it's not that he didn't deliver. It's that he fraudulently put a different name on the song. The songs were delivered, but they were delivered in someone else's name.'" (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 40 (quoting Catala Dep. (Dkt. No. 146-2) at 80)) According to Catala, Shin "didn't fail to deliver compositions that were in his name," but he only "delivered 2 percent in his name. He delivered small portions of the song in his name. He just didn't deliver the accurate amount of the ownership of the song." (Catala Dep. (Dkt. No. 146-2) at 76-77) Catala contends that Shin

> would go the studio. He would create music that's supposed to funnel through our agreements, but instead, he would place the music in [Shin's friend's] name, or another name that – of someone who's not even in the country, who was not present at the recording session, so that they could collect and that they could pick up the money and then funnel it back to Shin.

14

(<u>Id.</u> at 75-76)[11]

**F.      Payments to Majic**

Between June 3, 2009 and May 2, 2022, Sony paid Majic $503,039.82 in advances, royalties, and other unspecified credit card balance and cash payments.  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 43-44)  Plaintiff acknowledges that Majic has received approximately $225,000 in royalties for "'musical compositions that Sony administers on behalf of Plaintiff in the contractual relationship between all parties identified in Contract 1.'"  (<u>Id.</u> ¶ 45 (quoting Hochberg Decl., Ex. E (Dkt. No. 156-5) at 4))

**G.      Plaintiff's Expert Report**

Plaintiff has proffered an expert report from Gary W. Cohen concerning the "damages related to [Plaintiff's] breach of contract claims."  (Pltf. Subm., Ex. 35 ("Cohen Report") (Dkt. No. 150-7) at 3)  Cohen is a certified public accountant and the founder and president of Gary Cohen Corporation, which has "conducted over 1,000 royalty audits on behalf of recording artists, songwriters, producers, and other music entertainment companies."  Cohen has "conducted many valuations of both music publishing and recorded music catalogs," and has "over 35 years of experience in the entertainment industry as a forensic accountant and business manager."  (<u>Id.</u>)

According to Cohen, "the best way to determine the amount that Shin owes Catala is to tabulate the royalties and other consideration received by Shin from the exploitation of the relevant compositions."  (<u>Id.</u> at 6)  Cohen "requested, but did not receive, documentation detailing the total amount of revenue collected by Shin from 2009 to the present.  Accordingly,

---

[11]  As discussed below, this Court dismissed Catala's fraud claims against Shin and the Joombas Defendants for failure to state a claim.  (<u>See</u> Sept. 23, 2019 Order (Dkt. No. 80) at 26-27)

[Cohen] cannot accurately determine the amount due Catala." (Id.)  In his report, Cohen

"provides a floor for the amount owed by Shin to Catala." (Id. at 7)

Based on the documents available to him, Cohen has determined that "Catala is

due 50% of the royalties attributable to Shin," which amount to at least $603,654. (Id.)

"Alternately, . . . [if] the [r]atio [applied in the 2018 Settlement Agreement were applied

here,] . . . Catala is due at least $675,000." (Id. at 8)

Cohen's calculations are based on the following:

Shin entered into an administration agreement with Warner/Chappell Music
[("WCM")], dated January 20, 2017[ ]and received advances totaling . . .
[$]667,500[];

Shin entered into an administration agreement with Universal Music Publishing
Kora ("UMPK") which preceded the administration agreement with [WCM].  The
WCM Agreement refers to the UMPK agreement.  [Cohen] received one royalty
statement rendered by UMPK to Shin which stated that Shin earned . . . [$]471[].
[Cohen] did not receive any other UMPK royalty statements or the agreement
between UMPK and Shin;

Shin produced a royalty statement for 10 compositions from an unspecified
source for the period [from November 2012 through January 2014] totaling . . .
[$]136,487[];

Shin produced a royalty statement for 10 compositions from an unspecified
source for the period [from November 2012 through January 2014] stating that
Shin's share of writer royalties total . . . [$]1,835[];

Shin produced a summary of royalties paid by KOMCA (Korean Music
Copyright Association) to Joombas for the period [June 2012 through April 2017]
and the amount of these royalties attributable to Shin.  These documents indicate
that Shin's share of profits from this source for this period, after payment of
writers and fees, is . . . [$]107,052[];

Shin produced royalty statements rendered by [Reid and EMI] to Shin for the
semiannual periods [from the second half of 2016 through the first half of 2021].
Shin's royalties on these statements total $8,963;

Shin produced various lists of compositions which indicate that Shin wrote or
acquired many more compositions than those detailed in the statements cited in
[the documents discussed above];

Catala and Shin entered into a co-publishing agreement with EMI in 2009 that contemplated two option advances. The first option advance would have been at least $135,000 and at most $270,000 and the second option advance would have been at least $150,000 and at most $300,000. Since these amounts would have been split evenly between Catala [and Shin] if Shin had not breached his agreement with Catala, [a]s a result Catala missed out on at least $142,500 in additional advances and at most $285,000 in additional advances from Contract 2.

(Id. at 7 (citations omitted))

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on September 14, 2018. (See Cmplt. (Dkt. No. 1)) In the Complaint, Catala contends that Shin did not provide Catala with compositions he had acquired or wrote, and thus breached Contracts 1, 2, and 3, committed fraud, and violated the Copyright Act. (Id. ¶¶ 35-52, 75-89, 95-103) Catala also seeks an accounting from Shin. (Id. ¶¶ 90-94) The Complaint also asserts fraud and tortious interference with contract claims against the Joombas Defendants (id. ¶¶ 75-89, 104-112), and breach of contract and breach of fiduciary duty claims against the Reid Defendants. (Id. ¶¶ 53-74)

Shin and the Joombas Defendants moved to dismiss on November 26, 2018 (Mot. (Dkt. No. 50)), and the Reid Defendants moved to dismiss on February 7, 2019. (Mot. (Dkt. No. 67))

In a September 23, 2019 order, this Court granted the motions to dismiss filed by the Joombas Defendants and the Reid Defendants. (Sept. 23, 2019 Order (Dkt. No. 80) at 30) Shin's motion to dismiss was granted in part and denied in part. (Id. at 17, 30)

In dismissing Plaintiff's breach of contract claims against the Reid Defendants, this Court concluded that "most of the[] allegations [in the Complaint] are made either without reference to any contractual provision setting out [any] duty [owed under Contract 2 or 3], or by misconstruing the relevant provisions." (Id. at 20-23) The Court also dismissed Plaintiff's breach of fiduciary duty claim against the Reid Defendants, finding that "[t]he Complaint does

17

not plead facts sufficient to demonstrate that [Plaintiff] had a fiduciary relationship with the Reid Defendants." (Id. at 24)

In dismissing Plaintiff's tortious interference with contract claim against the Joombas Defendants, this Court concluded that "Plaintiff has not alleged facts sufficient to show that [the Joombas Defendants] procured Shin's breach." (Id. at 25)  And in dismissing Plaintiff's fraud claim against the Joombas Defendants and Shin, this Court found that the Complaint's allegations "do not demonstrate a 'legal duty separate from' Shin's obligations under Contracts 1, 2, and 3, nor do they make out 'a fraudulent misrepresentation [that is] collateral or extraneous to' these contracts."  This Court further concluded that "[t]he Complaint . . . does not adequately plead facts that make out the elements of fraud, much less comply with the heightened pleading standards of Fed. R. Civ. P. 9(b)." (Id. at 27 (alteration in original) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996); Guilbert v. Gardner, 480 F.3d 140, 148 (2d Cir. 2007)))

The Court also dismissed Plaintiff's Copyright Act claim against Shin, finding that Plaintiff "does not identify what provision or provisions of the Copyright Act Shin allegedly violated," and "does not explain how the Copyright Act addresses the conduct about which Plaintiff complains." (Id. at 28)

The Court dismissed Catala's claim for an accounting because "the Complaint does not assert – much less plead facts suggesting – that Plaintiff and Shin had 'relations of a mutual and confidential nature,'" and instead "merely alleges that Plaintiff and Shin were signatories to various publishing agreements," which does not satisfy the first element of an accounting claim.  (Id. at 29 (quoting Rosa v. TCC Commc'ns, Inc., No. 15 Civ. 1665, 2016 WL 67729, at *7 (S.D.N.Y. Jan. 5, 2016)))

This Court also dismissed Catala's claims that Shin breached Contracts 2 and 3, finding that "none of th[e] 'terms, covenants, and conditions' [in Contract 2] obligate Shin to deliver compositions to Majic," and "Contract 3 likewise does not impose an obligation on Shin to deliver compositions to Majic." (Id. at 19 (quoting Cmplt., Ex. B (Dkt. No. 1-2) at 15))

As to Catala's claim that Shin breached Contract 1, this Court found that "Contract 3 expressly modifies the delivery obligations set out in Contract 2, and – because Contract 1 'shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]' – Contract 3 also modifies Contract 1's delivery obligations." (Id. at 16 (alteration in original) (citation omitted) (quoting (Cmplt., Ex. A (Dkt. No. 1-1) at 7, § 13)) The Court concluded that, "[a]fter execution of Contract 3, Shin no longer was required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid." Accordingly, "to the extent that [Catala]'s claim for breach of Contract 1 concerns conduct that took place after Contract 3 was executed in January 2014, Shin's motion to dismiss [Catala]'s breach claim will be granted." (Id.)

As a result of this Court's September 23, 2019 order, the Complaint's only surviving claim is for breach of Contract 1 against Shin, and then only as to conduct that took place prior to the execution of Contract 3 on January 1, 2014.

On October 7, 2019, Catala moved for reconsideration of the September 23, 2019 order, and to amend the Complaint. (Pltf. Mot. (Dkt. No. 82)) This Court denied Plaintiff's motion on March 31, 2021. (Mar. 31, 2021 Order (Dkt. No. 93); see also May 20, 2021 Mem. (Dkt. No. 100))

On April 30, 2022, Catala moved for summary judgment on his surviving breach of contract claim, and on May 2, 2022, Shin cross-moved for summary judgment on that claim. (Mot. (Dkt. No. 145); Mot. (Dkt. No. 155))

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert, 480 F.3d at 145). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, a court must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

20

mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). A moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment." Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citation omitted) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 314 (2d Cir. 1981)).

B.      **Principles of Contract Law**

Under New York law,[12] the elements of a breach of contract claim include "'(1)
the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3)
breach of contract by the defendant, and (4) damages.'" Mindspirit, LLC v. Evalueserve Ltd.,
346 F. Supp. 3d 552, 574 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select
Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).  "[W]hether the
contract is ambiguous is a question of law for the court." Law Debenture Tr. Co. of N.Y. v.
Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010).  "Contract provisions are unambiguous
if they 'have a definite and precise meaning . . . concerning which there is no reasonable basis
for a difference of opinion.'" LVP Assocs. L.L.C. v. Bank of China, N.Y. Branch, No. 17 Civ.
5274 (SHS), 2017 WL 5514523, at *4 (S.D.N.Y. Nov. 16, 2017) (omission in original) (quoting
Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)).  By contrast, a contract is ambiguous
"where its language is susceptible to multiple reasonable interpretations." Summit Health, Inc.
v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014) (citing Brad H. v.
City of N.Y., 17 N.Y.3d 180, 186 (2011)).  "Ambiguity will not be found," however, "'where
one party's view strains the contract language beyond its reasonable and ordinary meaning.'"
Governmental Emps. Ins. Co. v. Ohio Cas. Grp., 47 F. Supp. 3d 190, 194 (S.D.N.Y. 2014)
(internal quotation marks omitted) (quoting Seiden Assocs., Inc. v. ANC Holdings, Inc., 959
F.2d 425, 428 (2d Cir. 1992)).  "[A]mbiguity does not exist 'simply because the parties urge

---

[12]  Contract 1 provides that it "shall be governed by New York law." (Contract 1 (Dkt. No. 157-
1) § 14(a))

different interpretations.'" Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir.

2001) (quoting Seiden Assocs., 959 F.2d at 428).

      "'[E]xtrinsic evidence may not be considered unless the [contract] itself is

ambiguous.'" Summit Health, 993 F. Supp. 2d at 390 (first alteration in original) (quoting

Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 98 A.D.3d 403, 406 (1st Dep't

2012)); see also Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)

(quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,

Eng., 136 F.3d 82, 86 (2d Cir. 1998)) ("'[I]f the court finds that the contract is not ambiguous[,]

it should assign the plain and ordinary meaning to each term and interpret the contract without

the aid of extrinsic evidence.'").  "When a contract is ambiguous and there is relevant extrinsic

evidence as to the parties' intent, the proper interpretation of the disputed language [is generally]

a question of fact for the jury." Summit Health, 993 F. Supp. 2d at 391 (citing Seiden Assocs.,

959 F.2d at 428); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir.

2011) ("[C]ontract claims are generally not subject to summary judgment if the resolution of the

dispute turns on the meaning of an ambiguous term or phrase.").

      "Although a determination that a contract is ambiguous ordinarily requires denial

of summary judgment, the court may nonetheless grant summary judgment where the extrinsic

evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no

reasonable person could decide to the contrary.'" N.Y. Marine & Gen. Ins. Co. v. Lafarge N.

Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (quoting Compagnie Financiere de CIC et de

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir.

2000)).  "Similarly, summary judgment may be granted despite any ambiguities in the contract

'where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor

of the nonmoving party's case.'" Id. (alteration in original) (quoting Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008)). "These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence vel non of genuine issues of material facts." Id.

## II.   ANALYSIS

It is undisputed here that Contract 1 is an enforceable contract, and Shin does not contend that Plaintiff did not adequately perform his duties under Contract 1.  (See Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 1; Shin Br. (Dkt. No. 158); Shin Opp. (Dkt. No. 166))

Catala argues that he is entitled to summary judgment because "it is undisputed that between September 14, 2012 and December 31, 2013, the Defendant breached a valid contract with the Plaintiff and caused the Plaintiff damages."[13]  (Pltf. Br. (Dkt. No. 152) at 6)

---

[13] "The parties are in agreement for purposes of [Plaintiff's summary judgment] motion that '[p]ursuant to the date the Complaint in this case was filed (9/14/2018), the Court's prior Order dated September 23, 2019 and the applicable six-year statute of limitations, the breach of contract claims that are actionable occur between September 14, 2012 and December 31, 2013.'" (Shin Opp. (Dkt. No. 166) at 15 (second alteration in original) (quoting Pltf. Br. (Dkt. No. 152) at 18); see also Pltf. Br. (Dkt. No. 152) at 19 ("Plaintiff's claims for breach of contract are limited to the Defendant's conduct from September 14, 2012."))

Because the parties agree that any actionable claim for breach of Contract 1 arose between September 14, 2012 and December 31, 2013, and because neither party argues that any claim arose before September 14, 2012, this Court finds that the six-year statute of limitations (see N.Y. C.P.L.R. § 213(2) ("[A]n action upon a contractual obligation or liability, express or implied" "must be commenced within six years.") does not bar Plaintiff's claims for breach of Contract 1.

Shin argues, however, that "[t]here is an argument to be made that Plaintiff is completely out of time, as his rights were extinguished on May 1, 2009, when he assigned exclusive administration rights with regard to [Shin's] compositions to Sony via Contract 2." (Shin Opp. (Dkt. No. 166) at 15 n.11)  Shin does not brief this argument, however, and in any event, in the September 23, 2019 order, this Court found "not persuasive" Shin's argument that – by virtue of the Exclusive Administrative Rights provision in Contract 2 – only Reid has authority to enforce the terms of Contract 2.  (Sept. 23, 2019 Order (Dkt. No. 80) at 18)

Catala further argues that Shin's "[a]ffirmative [d]efenses should be stricken because there is no question of fact which might allow any of the defenses to succeed, there is no question of law which might allow any of the defenses to succeed[,] and the plaintiff would be prejudiced by inclusion of the defenses."  (Id. at 19)

In cross-moving for summary judgment, Shin argues that

> [t]here is no question of material fact as to any of the following:  (i) Plaintiff has identified 122 musical compositions as those that he claims Defendant failed to deliver in accordance with Contract 1; (ii) only 14 of those musical compositions were released after December 31, 2013, and if, out of an abundance of caution, we include musical compositions released through June 30, 2014, the list grows to 16 musical compositions; (iii) each of the 16 identified musical composition[s] was delivered, as reflected both in Sony . . . royalty statements produced by Plaintiff, and as further confirmed by Sony['s] . . . response to the third-party subpoena served upon it by Defendant; and (iv) [Plaintiff] cannot substantiate any damages suffered [by] any alleged failure of delivery, as he admits to being paid more than his purported fair share of royalties, once obvious errors in his damages expert's report are corrected.

(Shin Br. (Dkt. No. 158) at 17-18 (emphasis omitted))  Shin further argues that Catala "presents no basis for striking any of the affirmative defenses."  (Shin Opp. (Dkt. No. 166) at 26)

### A.    Plaintiff's Summary Judgment Motion and Opposition

Plaintiff argues that Shin did not comply with Contract 1's "Delivery" requirement, and "took additional steps to conceal his interest in musical compositions by registering his publishing interest in subject compositions to other writers that he controlled through a separate company."  (Pltf. Br. (Dkt. No. 152) at 14-15)

In response, Shin argues that his "delivery obligation" under Contract 1 "is strictly limited to 'Your Interest in each Composition' . . . to the clear exclusion of portions of each Composition that were not 'Your Interest' – i.e., the interests held by others, including any 'Affiliates,' outside of 'that percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition.'"  (Shin Opp. (Dkt. No. 166) at 19) (emphasis

omitted) (citing Contract 1 (Dkt. No. 157-1) § 3))  Shin contends that "there is no dispute that [he] delivered his share ('Your Interest') in each [q]ualifying [c]omposition, and there can be no dispute that [that] is all that Contract 1 required."  (Id. at 19-20 (emphasis omitted))  Shin further argues that "[e]ven if one were to misread Contract 1 as requiring delivery of 'Compositions,' as opposed to 'Your Interest' in those Compositions, the breach of contract claim would also fail, as there is no dispute that all of the [q]ualifying [c]ompositions were in fact delivered."  (Id. at 22 (emphasis omitted))

Shin misreads the term "Your Interest" as used in Contract 1, however.  Contract 1 defines "you" to include, inter alia, "HIUK SHIN individually and d/b/a THE PUBLISHING DESIGNEE OF HIUK SHIN and any and all Affiliates, currently collectively professionally known as 'A Rex Productions.'"  (Contract 1 (Dkt. No. 157-1) at 1 (emphasis in original))  And Shin executed Contract 1 "[f]or himself and [on behalf of] any [and] all Affiliates."  (Id. at 10)  Contract 1 further defines "Affiliates" to mean "any Person which you own or in which you have an interest, in whole or in part, or which you employ or which employs you, and/or any Person, the operation of which is controlled directly or indirectly by you."  Contract 1 defines "Person" to mean "any individual, corporation, partnership, association or other organized group of persons of whatever nature, or legal successors or representatives of the foregoing."  (Id. §§ 12(e), (g))  "Your Interest" in a Composition means "that percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition."  (Id. § 3)  Accordingly, "you" means Shin and any of Shin's Affiliates, and "Your Interest" includes the percentage interest that results from Shin's authorship or ownership of a Composition, and the authorship or ownership interest of any of Shin's Affiliates in a Composition.

26

The parties appear to dispute whether the Joombas entities named in the

Complaint – Joombas Co. LTD., Joombas Music Int'l, Joombas LLC, and Joombas Music Group

(see Cmplt. (Dkt. No. 1) ¶¶ 2-5) – are "Affiliates" of Shin within the meaning of Contract 1.

Catala refers to "Joombas" generally throughout his submissions, without identifying any of the

Joombas entities (see, e.g., Pltf. Br. (Dkt. No. 152); Pltf. Opp. (Dkt. No. 162); Pltf. R. 56.1 Stmt.

(Dkt. No. 165)), and maintains that "Defendant operated Joombas as an Affiliate to Defendant,

as defined in Contract 1." (Pltf. Br. (Dkt. No. 152) at 8)  Shin asserts that "Plaintiff's use of the

term 'Joombas' throughout its Rule 56.1 statement is vague, as it is unclear to which entity or

entities Plaintiff means to refer." (Shin Resp. R. 56.1 Stmt. (Dkt. No. 166-21) ¶¶ 12, 14, 18)  In

Shin's submissions, he refers to the "Joombas Defendants" as those Joombas entities named in

the Complaint.  (See, e.g., Shin Br. (Dkt. No. 158); Shin Opp. (Dkt. No. 166))  For purposes of

Contract 1, however, Shin contends that he "is not his affiliates, nor was he required to deliver

his affiliates' shares of any compositions."  (Shin Br. (Dkt. No. 158) at 21 (emphasis omitted))

At deposition, Shin testified that he was an "executive producer" at "Joombas,"

and received income from "Joombas" for his work as executive producer.  It is not clear from the

deposition transcript, however, which Joombas entity Shin was referring to.  (Shin Dep. (Dkt.

No. 146-1) at 15, 46, 58)  Later in the deposition, Shin testified that "[i]t's important to clarify

that I was acting as CEO on behalf of the Joombas USA entity and not the main Joombas

headquarter entity.  As the face of the company, it was imperative that this structure be

established as such so that I would be able to sign writers." (Id. at 68)  Again, however, Shin

does not make clear which Joombas entity is "the Joombas USA entity" and which is "the main

Joombas headquarter entity."  According to Shin, "[w]hile there was a separation between the

actual entities and some of these titles, because we were a smaller company, there was no

corporate, per se, separation between the two territories.  I did reach out on behalf of Joombas as a whole, not a specific location or office."  (Id. at 69)  In sum, from Shin's deposition, his relationship to the Joombas entities named in the Complaint is not clear.

For his part, Catala asserts that "[i]n July 2011, Shin formed a company in Georgia and named the company[] Joombas ('Joombas')," citing Articles of Organization for a limited liability company in Georgia called "Joombas, LLC."  (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 12; Pltf. Subm., Ex. 8 (Dkt. No. 145-10))  Plaintiff further asserts that, in March 2012, "Shin identified himself as the Chief Executive Officer of Joombas," citing screenshots from a series of emails that do not specify any particular Joombas entity.  (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 13 (citing Pltf. Subm., Ex. 17 (Dkt. No. 147-5))  The exhibit Plaintiff cites in support of this factual assertion, however, shows that Shin's email signature identifies him as the Chief Executive Officer of Defendant "Joombas Music Group."  (Pltf. Subm., Ex. 17 (Dkt. No. 147-5) at 9, 15)

Although it appears that (1) Shin is the chief executive officer of Defendant Joombas Music Group and thus that this entity is an Affiliate for purposes of Contract 1; and (2) that Shin may serve as the executive producer for one or more Joombas entities, Plaintiff has not demonstrated as a matter of law that any Joombas entity other than Joombas Music Group employs Shin, or that Shin controls any Joombas entity.

Even if Plaintiff had offered evidence that all of the named Joombas entities are Shin's Affiliates – which he has not – Plaintiff has not offered evidence sufficient to demonstrate as a matter of law that Shin breached Contract 1.

As discussed above, Catala contends that Shin did not deliver to Majic or Sony the percentage interests that resulted from his individual authorship or ownership of the Compositions, or the percentage interests that resulted from the authorship or ownership interest

of any of his Affiliates in the Compositions.  (See Contract 1 (Dkt. No. 157-1) § 3)  Plaintiff

further contends that Shin "fraudulently" delivered songs "in someone else's name," in order to

avoid his obligations to Plaintiff under Contract 1.[14]  (Catala Dep. (Dkt. No. 146-2) at 75-77;

Cmplt. (Dkt. No. 1) ¶ 22 ("Shin purposely and knowingly attempted to defraud Majic of revenue

associated with the songs/compositions Shin acquired and authored, and hid the songs from

Majic for several years."))  Plaintiff has not shown that he is entitled to summary judgment as a

matter of law on his breach claim, however.  Indeed, Plaintiff has not proffered evidence

concerning these allegations sufficient to create a material issue of fact as to whether Shin

breached his obligations under Contract 1.

As an initial matter, Plaintiff does not dispute that Shin delivered Compositions

that resulted from Shin's individual authorship or ownership.  (See Shin R. 56.1 Stmt. (Dkt. No.

159) ¶¶ 30, 39-40; Catala Dep. (Dkt. No. 146-2) at 76 ("[Shin] didn't fail to deliver compositions

that were in his name."))  As discussed above, however, Catala contends that Shin fraudulently

minimized his percentage interest in the Compositions in order to deprive Catala of his rights

under Contract 1.

---

[14] As to Plaintiff's allegation that Shin fraudulently attributed songs he delivered to unrelated people or entities, Shin argues that "[n]o provision of Contract 1 prohibits Defendant from assigning writing credit to others[,] [and] no provision of Contract 1 addresses assignment of writing credit whatsoever."  (Shin Opp. (Dkt. No. 166) at 20-21)  This assertion is not correct.  Contract 1 provides that "[y]ou may not assign this Agreement, or any of your rights hereunder, or any of your rights or interests with respect to the Compositions, without the prior written consent of Publisher."  (Contract 1 (Dkt. No. 157-1) § 14(c))  As discussed, "Composition" means "(a) all musical compositions (or portions thereof or interests therein) written by you prior to or during the Term and (b) any and all other compositions written by you and/or acquired by you or your Affiliates during the Term."  (Id. § 3)  Accordingly, absent Majic's written consent, Contract 1 prohibits Shin from assigning his "rights or interests" in any musical compositions that were written or acquired by him or by his Affiliates.

Catala testified that "[Shin] delivered 2 percent in his name.  He delivered small portions of the song in his name.  He just didn't deliver the accurate amount of the ownership of the song."  (Catala Dep. (Dkt. No. 146-2) at 76-77)  As discussed above, Catala asserts that

> [Shin] would go the studio.  He would create music that's supposed to funnel through our agreements, but instead, he would place the music in [Shin's friend's] name, or another name that – of someone who's not even in the country, who was not present at the recording session, so that they could collect and that they could pick up the money and then funnel it back to Shin.

(Id. at 75-76)

Catala further contends that "there's over 150 songs that [Catala] believe[s] . . . should fall under Contract 1, that are out there, that [Catala is] not being paid on," and that "there might be 300 songs.  There's a lot of songs out there that – upwards to a couple hundred that [Catala] ha[s] not received a penny on."  (Id. at 259-60)

All of Catala's testimony about Shin's alleged breach is entirely speculative, however.  He has not offered evidence that Shin "didn't deliver the accurate amount of . . . ownership of [a] song," nor has he offered evidence that Shin fraudulently attributed to other individuals or entities songs that he or his Affiliates had created or acquired.  Catala likewise does not identify what Compositions Shin mischaracterized, let alone demonstrate whether these Compositions are subject to Contract 1.  Nor does Catala offer evidence as to what "amount . . . of ownership" Shin was required to deliver, but did not.  In short, there is a complete failure of proof as to Plaintiff's claim that Shin and his Affiliates "didn't deliver the accurate amount of . . . ownership of [a] song [subject to Contract 1]."

In support of his breach claim, Plaintiff cites to several exhibits that he contends reference compositions for which Shin "never [d]elivered, reported or registered his Affiliate's administration rights or publishing interest . . . to Catala or Sony."  (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶¶ 19-23 (citing Pltf. Subm., Ex. 13 (Dkt. No. 147-1); Pltf. Subm., Ex. 15 (Dkt. No. 147-3);

Pltf. Subm., Ex. 16 (Dkt. No. 147-4); Pltf. Subm., Ex. 26 (Dkt. No. 149-1); Pltf. Subm., Ex. 27

(Dkt. No. 149-2)))  None of these exhibits shows an interest held by Shin or a Shin Affiliate in

any composition that Defendant was required to – but did not – deliver to Majic or Sony under

Contract 1, however.

        Plaintiff's Exhibit 13 is an unexecuted "writer agreement" between Joombas Co.,

Ltd. and Edward Ross Lara, a non-party songwriter.  Although the agreement states that Lara

"sells, assigns, transfers and sets over to [Joombas Co., Ltd.,] free and clear of any encumbrance

whatsoever fifty percent (50%) of all right, title and interest in and to the [c]ompositions [that are

listed in Schedule A]," and that the agreement "regards only those certain songs listed in

Schedule A," Schedule A is blank.  (See Pltf. Subm., Ex. 13 (Dkt. No. 147-1) at 1, 12)

        Plaintiff's Exhibit 15 appears to show the "shares" of several compositions that

are credited to several songwriters and publishers.  (See Pltf. Subm., Ex. 15 (Dkt. No. 147-3))  In

this document, "shares" of each composition are credited to Shin as a songwriter, and none are

credited to a Joombas entity.  (Id.)  Among the compositions listed in this exhibit are

compositions that Catala has admitted Shin properly delivered his individual authorship and

ownership interests in.  (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶ 30; Catala Dep. (Dkt. No.

146-2) at 76)  Although some shares of some compositions are credited to songwriters for whom

"Joombas publish[ed] and administer[ed] the publishing," and who were "sign[ed] . . . to

Joombas Publishing" generally (see, e.g., Shin Dep. (Dkt. No. 146-1) at 73, 85, 90, 93-94, 96-

97), Plaintiff has not offered evidence that (1) Shin or any Joombas entity had "authorship and/or

ownership rights" in these compositions as of the registration dates shown, or (2) what

percentage interest Shin or any Joombas entity had that resulted from those "authorship and/or

ownership rights."  Accordingly, Plaintiff has not shown that he is entitled to any of these

"shares."  And even if Plaintiff had made such a showing, Plaintiff has not shown (1) what percentage interest he is owed or (2) that this interest was not delivered under Contract 1.

Plaintiff's Exhibit 16 is a list of compositions that Hyeong-Kyu Kim – who was chief executive officer of an unspecified Korean Joombas entity from 2009 to 2017 (see Shin Dep. (Dkt. No. 146-1) at 46, 59, 68) – and other songwriters "that Joombas had signed" or whose compositions Joombas "published and administered" (see id. at 84-90, 93-98), are credited with writing.  (See Pltf. Subm., Ex. 16 (Dkt. No. 147-4))  Plaintiff's Exhibit 26 is a list of compositions and the "[d]istributed [r]oyalty" for each composition.  (See Pltf. Subm., Ex. 26 (Dkt. No. 149-1))  Plaintiff's Exhibit 27 – entitled "Joombas 2012-2017 Royalties" – is a spreadsheet reflecting the "[f]inal [p]ublishing [i]ncome" for "Joombas."  The spreadsheet does not indicate what Joombas entity or entities are addressed in the spreadsheet.  The spreadsheet appears to list royalties by songwriter by year, but does not show on which compositions royalties were earned.  (See Pltf. Subm., Ex. 27 (Dkt. No. 149-2))

Nothing in the exhibits cited by Plaintiff shows that Shin or any of his Affiliates had any authorship or ownership rights in the compositions referenced therein; what percentage interest Shin or his Affiliates held in those compositions, if any; whether any of these interests are subject to Contract 1; or whether any such interest was delivered to Majic or Sony.

In support of his breach claim, Plaintiff also cites to deposition testimony taken during discovery, but none of this testimony demonstrates that Shin or his Affiliates failed to deliver any interest in any composition as was required under Contract 1.

Plaintiff points to Shin's deposition testimony that he "had no contact with Majic or LA Reid when [certain] songs were released" (Shin Dep. (Dkt. No. 146-1) at 48-49); that he did not "understand [Section 12(c)] of [Contract 1] . . . to mean that [he] had to deliver songs at

32

[the listed] address [for EMI]" (id. at 50); that he did not "report to . . . Catala, . . . Reid, EMI or

Sony that [Hyeong-Kyu] Kim was claiming large portions of [Shin's] interest in songs" (id. at

103); and that he did not "pay any of the income [Shin] received from Joombas to . . . Catala, . . .

Reid, EMI or Sony." (Id. at 103-04)  Plaintiff further cites his own testimony in which he claims

– in a speculative and conclusory manner – that "[Shin] fraudulently placed music compositions

in other people's names." (Catala Dep. (Dkt. No. 146-2) at 120)  None of this testimony shows

that Shin or any Shin Affiliate had any interest in Compositions that were not delivered under

Contract 1, however.

Although it is undisputed that, "[i]n 2011, Shin began to place large portions of

his copyright, publishing and administration interest in musical compositions in the name of

[Hyeong-Kyu] Kim" (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 24), Plaintiff has not proffered

evidence that any Joombas entity had any "authorship and/or ownership rights" in these

compositions.  Although "Joombas publish[ed] and administer[ed] the publishing of [Hyeong-

Kyu] Kim" generally (Shin Dep. (Dkt. No. 146-1) at 73), Plaintiff has not shown (1) that any

such composition published by a Joombas entity was subject to Contract 1; (2) that Shin or any

Joombas entity had authorship or ownership rights in any such compositions at that time; (3)

what percentage interest resulted from any such authorship or ownership right; or (4) that any

such interest was not properly delivered to Majic or Sony pursuant to Contract 1.[15]

---

[15]  Catala argues that Shin breached Contract 1's Minimum Delivery and Release Commitment
("MDRC") provision.  The MDRC provision provides that "[d]uring each Contract Period, you
shall Deliver to Publisher ('Minimum Delivery and Release Commitment' or 'MDRC') at least
four (4) Full New Compositions, or the fractional equivalent."  (Contract 1 (Dkt. No. 157-1) § 4)
According to Plaintiff, "[b]y falsely reporting his creative and publishing interest in musical
compositions that Defendant acquired, the Defendant prevented the Plaintiff from advancing
through the options of the MDRC."  (Pltf. Br. (Dkt. No. 152) at 15; see also Pltf. Opp. (Dkt. No.
162) at 15)  Shin responds that "despite numerous opportunities to do so, Plaintiff has never

\*      \*      \*      \*

As discussed above, under Fed. R. Civ. P. 56, a moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'"  Nick's Garage, 875 F.3d at 114 (quoting Farid, 850 F.2d at 924).  Here, it is an essential element of Plaintiff's breach of contract claim that Shin or a Shin Affiliate failed to deliver an authorship or ownership interest in a Composition that Shin or a Shin Affiliate was required to deliver under Contract 1.  Because Plaintiff has not offered evidence that creates a material issue of fact as to this "essential element," Plaintiff's motion for summary judgment will be denied, and Shin's motion for summary judgment will be granted.

---

identified a single musical composition where the manner in which writing credits were distributed violated Contract 1," and "[b]ecause all of the qualifying compositions were in fact delivered to Sony . . . Plaintiff can identify no more than a theoretical, technical violation of protocol, but no material breach of Contract 1."  (Shin Br. (Dkt. No. 158) at 23; see also Shin Opp. (Dkt. No. 166) at 23-24)

While Plaintiff asserts – in a conclusory manner – that "[a]s of January 1, 2014, Shin had not fulfilled the terms of [the MDRC provision] under the First Contract Period in Contract 1 and was still under contract with Catala and . . . [Sony]," (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 10), he has not offered evidence that Shin failed to deliver four new compositions or the fractional equivalent.  Catala merely offers Shin's deposition testimony that he did not "understand [Section 12(c)] of [Contract 1] . . . to mean that [he] had to deliver songs at [the listed] address [for EMI]" (Shin Dep. (Dkt. No. 146-1) at 50), and his own speculative testimony that "[Shin] fraudulently placed music compositions in other people's names."  (Catala Dep. (Dkt. No. 146-2) at 120)  Accordingly, Catala has not set forth evidence sufficient to create a material issue of fact as to whether Shin breached this provision.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for summary judgment is denied, and Defendant Shin's motion for summary judgment is granted.  Plaintiff's motion to strike Defendant's affirmative defenses is denied as moot.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 145, 155) and to close this case.

Dated:  New York, New York
         September 19, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge